IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KAIMEL GLENN, #328757 | * | |
| Plaintiff, | | |
| v. | * | CIVIL NO.: WDQ-09-1700 |
| | | |
| CORRECTIONAL MEDICAL SERVICES, *et al*. | * | |
| Defendants. | * | |
| | *** | |

MEMORANDUM

Kaimel Glenn has filed a civil rights complaint under 42 U.S.C. § 1983 against Correctional Medical Services ("CMS") and Dr. Isaas Tessema. Paper No. 1. Glenn seeks injunctive relief (a knee brace) and $50,000.00 in punitive damages. *Id*. Pending is the Defendants' motion to dismiss or, in the alternative, for summary judgment. Paper No. 13. For the following reasons, the motion for summary judgment will be granted.

I.   BACKGROUND

Defendants assert--by submission of Dr. Colin Ottey's affidavit and Glenn's medical records--that constitutionally adequate medical care has been afforded to Glenn.[1] The following information has been provided.

Glenn is a forty-eight year old male with a history of diabetes, myocardial infarction (heart attack) with coronary bypass surgery, and angina. From December 12, 2008 to March 15, 2009, Glenn frequently complained of pain and swelling in his left knee. Paper No. 13, Ex. A; Ex. B at pgs. 3-18. Defendants state that Salsalate, a non-steroidal anti-inflammatory drug ("NSAID"), had

---

[1] Defendant Correctional Medical Services, Inc. ("CMS") argues that the Complaint should be dismissed against it because as a corporate entity it cannot be held liable under 42 U.S.C. § 1983. The Court agrees. A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009). CMS's Motion for Summary Judgment will therefore be granted.

been prescribed for Glenn in 2008, but on June 7, 2008 he refused to continue taking it. *Id*., Ex. A. On January 14, 2009, Glenn requested a knee brace from medical personnel. Nurse Hetty Trenum evaluated Glenn on January 14, 2009 and noted that his left knee was slightly swollen and had been wrapped with gauze, which Glenn said was for comfort. Paper No. 13, Ex. A; Ex. B at pgs. 3-4. Trenum referred Glenn to Dr. Ottey. *Id*.

Glenn was evaluated by Ottey on February 4, 2009, for complaints of pain, stiffness, and weakness in his left knee. *Id*., Ex. A; Ex. B at pgs. 10-14. He told Ottey that he had previously used a knee brace. Ottey prescribed Salsalate for the knee pain and referred Glenn to the Physical Therapy ("PT") Department for further evaluation and treatment. Ottey also ordered an x-ray of Glenn's knee, but Glenn refused to have the x-ray taken. On March 8, 2009, Stacey Warnick, a physical therapist, evaluated Glenn's left knee. Glenn told Warnick that he was soon to receive a knee replacement and that although she could "mess with" his knee if she wanted to, he was still going to need the surgery. *Id*., Ex. A; Ex. B at pgs. 16-17. Warnick's evaluation revealed that Glenn resisted passive range of motion ("ROM") and that he had more available ROM than he actively demonstrated. *Id*., Ex. A. He was advised that he would be taught exercises to prepare him for surgery. *Id*. Warnick also advised Glenn that he could do these exercises on his own, and this would help him with further rehabilitation after his surgery. *Id*. Glenn rejected Warnick's treatment plan, telling her that she did not know what she was doing, he did not want PT, and she would hear from his lawyer. *Id*. Warnick indicated that no further attempts would be made to treat Glenn under the current physician's order, and Glenn was taken back to his cell. *Id*. The Salsalate 500 mg. prescription was renewed on April 20, 2009. *Id*. Glenn took the medication sporadically, frequently refusing the morning dose and, on occasion, the evening dose. *Id*.

Glenn offered no further complaints of pain in his knee until June 15, 2009, when he filed a sick-call encounter form. *Id.*, Ex. A; Ex. B at pg. 20. He received Motrin and muscle rub for knee pain. Dr. Tessema renewed Glenn's recommendation for a bottom bunk for one year. Paper No. 13, Ex. A; Ex. B at pgs. 21-22. On June 20, 2009, Glenn filed another sick-call request complaining that his knee was very swollen and painful. On June 23, 2009, he was evaluated by Nurse Trenum, who noted that the knee was slightly swollen. Glenn was advised to apply warm compresses to his knee, continue to take his Salsalate, and return to sick-call if his problem did not improve. *Id.*, Ex. A; Ex. B at pgs. 23-25. Glenn filed another sick-call request on June 30, 2009, asking medical staff to look at his knee. When he was called for his evaluation, however, Glenn refused to be seen by the nurse. *Id.*, Ex. A; Ex. B at pg. 26. The medical department received a sick-call request from Glenn on July 3, 2009, complaining of knee pain. He was called for an evaluation but again refused to report to sick-call. *Id.*, Ex. A; Ex. B at pgs. 27-28.

Glenn offered no further complaints about his knee until September 7, 2009, when he filed a sick-call encounter form complaining of swelling and pain. He was examined by Dr. Ottey on September 9, 2009. *Id.*, Ex. A; Ex. B at pgs. 29-35. Glenn complained of stiffness of the knee, that it was "locking" on him, and that he was experiencing numbness and tingling. Ottey's examination revealed some knee tenderness and moderate pain with motion, but no swelling or decrease in the ROM of the knee. Ottey ordered a knee brace, which was received by Glenn that same day. Ottey also ordered an x-ray of the left knee and referred Glenn to a physical therapist for evaluation and treatment.

On September 14, 2009, an x-ray taken of Glenn's left knee revealed a 2 centimeter partially calcified loose body in the area above Glenn's patella (kneecap) region and some small spurs of the knee that indicated minimal degenerative joint disease. *Id.*, Ex. A; Ex. B at pg. 32.

As Glenn continued to refuse to take his NSAID Salsalate dosages, the medication was changed to "keep on person"—which allowed Glenn to keep the medication in his cell and take it as needed—and he received 60 tablets on November 30, 2009. Glenn was evaluated by the PT Department on December 22, 2009. The therapist noted that Glenn had a moderately antalgic (limping) gait and some instability of his knee. The therapist recommended PT twice a week. During the second PT treatment on December 28, 2009, Glenn stated that his pain had lessened. Paper No. 13, Ex. A; Ex. B at pgs. 52 & 56.

Ottey evaluated Glenn on December 27, 2009. Glenn told Ottey that he had been taking the Salsalate, but it had not been providing him adequate pain relief. *Id.*, Ex. A; Ex. B at pgs. 53-54. He did acknowledge that the knee brace was affording him some relief. Ottey increased the NSAID to 750 mg. twice a day, ordered another knee x-ray, and asked the radiologist to try to identify the loose body in Glenn's knee. *Id.*, Ex. A; Ex. B at pg. 55.

In his Opposition Glenn indicates that he continues to see physicians and Dr. Ottey has placed him on a prescription regimen. Paper No. 20. He claims that he requires a knee replacement at once and he is not receiving the "right care." Glenn asks the Court to move him out of WCI to another facility where he can receive better care.[2]

II.   ANALYSIS

    A.   Standard of Review

Under Rule 56(c), summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] Attached to the Opposition are exhibits concerning Glenn's 2003 knee surgery at Greater Southeast Community Hospital in the District of Columbia and extracts from Glenn's prison medical records, including sick-call requests. Paper No. 20 at Exs.

56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B .  Eighth Amendment Claim

As an inmate claiming denial of medical care in violation of the Eighth Amendment, Glenn must prove two elements: one objective and one subjective.  First, he must satisfy the objective element by illustrating a serious medical condition.  *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).  If this first element is satisfied, Glenn must then prove the subjective element by showing "deliberate indifference" on the part of prison officials or health care personnel.  *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991).  "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837.  Health care staff are not liable if they "knew the underlying facts but believed

5

(albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

The unrefuted documents presented to the Court show that Glenn has received continuous assessment and treatment for his knee. He has been evaluated by nurses, physicians and physical therapists and has received diagnostic tests (x-rays), NSAIDS, PT, and the knee brace he requested in this Complaint. Glenn's dissatisfaction with treatment amounts to nothing more than a disagreement between medical staff and an inmate as to a course of treatment, and does not rise to a constitutional injury. *See Davis v.* Greene, 2009 WL 3064106, at *13 (S.D. W.Va. Sept. 18, 2009).

III.   CONCLUSION

Given the conservative and measured response by medical personnel to Glenn's knee pain and swelling, Glenn has failed to show a genuine issue of material fact as to his entitlement to relief. Accordingly, the Defendants' Motion for Summary Judgment will be granted. A separate Order follows.


Date: <u>April 8, 2010</u>                             <u>        /s/            </u>
                                        William D. Quarles, Jr.
                                        United States District Judge